Filed 10/14/22  In re B.M. CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.M., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. K.M., Defendant and Appellant. | A165003 (Alameda County Super. Ct. No. JD-031579-01) |

Mother appeals an order terminating her parental rights and placing her now three-year-old daughter, B.M., for adoption. She contends the juvenile court erred in concluding there was no beneficial parental relationship justifying an exception to the statutory preference for adoption. (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i).) We find no prejudicial error and affirm the order.

**Background**

In September 2019, the Alameda County Social Services Agency (the agency) filed a petition alleging that then 10-month-old B.M. was at

---

[1] All statutory references are to the Welfare and Institutions Code.

substantial risk of harm pursuant to section 300 subdivisions (b) and (j).[2] The petition alleged that the child was born with a cleft lip and palate and that, as a result of mother's failure to provide necessary medical care, the child was severely malnourished; the family home was infested with fleas; and mother is involved in a relationship characterized by domestic violence. The petition also alleged that mother's four older children are in a foster home "due to [her] extensive domestic violent relationships . . . , extensive history and use of methamphetamine and unsuitable living conditions."[3] The child had been removed from mother's care and placed in the same foster home.

In October 2019, the court found the allegations of the petition true and B.M. was found to be a child described by section 300, subdivision (b), (g), and (j). B.M. was continued in her foster placement and reunification services were ordered for mother.

Mother received 18 months of reunification services. The agency's review hearing report indicated that mother is "consistently prepared when she shows up for visits and is engaged with [her daughter]" but also noted several late or missed visits. Mother's communication with the agency and participation in services was also mixed. The agency reported that mother was not in communication with the agency from November 2020 to January 2021. She missed 14 drug tests from October to January but the results for the tests she completed were negative. She participated regularly in

_____

[2] The petition includes an allegation under section 300, subdivision (g) that the identity and whereabouts of the father are unknown. B.M.'s father was later identified and he participated in the proceedings. Father did not file a notice of appeal.

[3] B.M.'s siblings were detained in September 2019 following jurisdictional findings made in August 2018. Mother's parental rights as to these children were terminated in September 2020.

domestic-violence counseling but did not participate in substance-abuse counseling.

In June 2021, at the 18-month review hearing, the court terminated mother's reunification services and set a section 366.26 hearing.[4]

The agency's report submitted in advance of the section 366.26 hearing indicated that in the preceding year, mother visited with her daughter twice a week for several hours at first and later once a week for 4.5 hours to accommodate the child's preschool schedule. While visits were occasionally missed, there are no unexplained gaps in visitation during that period. Prior reports indicated that B.M. had "a positive relationship and bond with her mother and seems to enjoy their visits" and the section 366.26 report described mother as an "important person in her life." The report also indicated, however, that "[B.M.] looks forward to visits with her mother, but becomes distressed when the plan changes at the last minute, and this impacts her relationship with [mother]." The report concluded, "There are no known barriers to permanency. [B.M.] has been determined to be adoptable. She appears to be thriving in the proposed adoptive home where she has been placed since she was nine months old. Her special medical needs are being addressed and the proposed adoptive parents have been consistently attentive to her physical, developmental and emotional needs. The proposed adoptive parents actively facilitate [B.M.'s] relationship with her four older siblings who continue to reside in the home."

On February 22, 2022, at the section 366.26 hearing, the court found clear and convincing evidence that B.M. was likely to be adopted, identified

---

[4] Mother did not appear at the 18-month review hearing.

adoption as the permanent plan, found no exception applied, and terminated mother's parental rights.[5] Mother timely filed a notice of appeal.

## Discussion

The purpose of a section 366.26 hearing is "to select and implement a permanent plan for the child after reunification efforts have failed. [Citation.] At that stage, 'the welfare agency's focus shifts from monitoring the parents' progress toward reunification to determining the appropriate placement plan for the child.' [Citation.] The dependency statutes embody a presumptive rule that, after reunification efforts have failed, parental rights must be terminated in order to free a child for adoption. [Citation.] However, the statutes provide an exception where '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' " (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852; § 366.26, subd. (c)(1)(B)(i).)"

To establish this exception, the parent must show by a preponderance of the evidence "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*In re Caden C.* (2011) 11 Cal.5th 614, 631 (*Caden C.*), italics omitted.) As to the first element, the juvenile court considers whether the parent visits consistently, "taking into account 'the extent permitted by court orders.' " (*Id.* at p. 632.) As to the second element, the court assesses whether " 'the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.' " (*Id.*

---

[5] Mother had not appeared at a prior hearing in December at which the court found that B.M. was adoptable, but she appeared late at the February 22, 2022 hearing at which parental rights were terminated.

at p. 636.) "Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Id*. at p. 633.) When evaluating detriment, the court does not compare "the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id*. at p. 634.) Rather, the question is "whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid*.) The permanency planning hearing is "not a contest of who would be the better custodial caregiver" (*ibid*.) and a "parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Id*. at p. 637.)

On appeal, we apply a hybrid standard of review. (*Caden C*., *supra*, 11 Cal.5th at p. 639.) We apply a substantial evidence standard to the court's findings on the first two elements and review the court's determination on the final element, whether the termination of parental rights would be detrimental to the child, for abuse of discretion. (*Id*. at p. 640.)

Initially, mother contends the court violated her due process rights by failing to engage in the three-part analysis set forth in the statute and clarified in *Caden C*. Mother faults the court for failing to make express findings on each of the three elements and for offering a "terse" analysis on the detriment element. The court's ruling is as follows: "As it relates to arguments as to why not to terminate parental rights, I don't find that there's any evidence that the alleged bond or relationship between the mother and [daughter] . . . is so strong that it would be most important to keep that relationship in place, versus the stability and permanence that grows from having an adoptive family. [¶] And so honestly as I just said, . . . I remember

5

when [B.M.] was born. And she's known her prospective adoptive parents most of her life because her siblings have been with this family as well. And I do think that it's important to say that all of the siblings are in the same home, the sibling group with this family that is willing to adopt each and every one of them. [¶] So I don't see that there's an exception as it relates to termination of parental rights."

Contrary to mother's argument, the juvenile court was not required to "recite specific findings relative to its conclusions regarding any or all of the three elements of the exception." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Although the court's statements in support of its conclusion are limited, nothing in the record supports mother's suggestion that the court failed to engage meaningfully in the "carefully calibrated process" that must be performed before terminating parental rights. (*Caden C.*, *supra*, 11 Cal.5th at p. 625.) The court was very familiar with the case and indicated that it had read and considered the various reports submitted in advance of the hearing. The court expressly indicated that "[t]ermination of parental rights is based on the findings made herein, and on the factual basis contained in the reports prepared by social services for this hearing, and includes that the court finds no exception to termination of parental rights exist."

Nonetheless, we emphasize that by "[g]oing step by step through the prescribed process, the court can somewhat more easily accomplish the statutory goals of protecting the parent and child from an overhasty termination of their relationship while ensuring that the child is expeditiously placed in a safe and stable home." (*Caden C.*, *supra*, 11 Cal.5th at p. 625.) Likewise, "a statement by the trial court of its findings (or reasons)

for its decision is helpful in conducting appellate review." (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1156.)

The record is somewhat mixed regarding mother's visitation and bond with her daughter. Nonetheless, for purposes of this appeal, we think it fair to assume that mother satisfied the first two elements.

Mother failed to establish, however, that terminating parental rights would harm B.M. "to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) B.M was nine-months old when removed from her mother's care. Since her removal, she has been placed with her siblings in a home with foster parents who are ready and approved to adopt her. The record indicates that while she had a positive, enjoyable relationship with her mother, the lack of predictability in that relationship caused B.M. distress. The trial court reasonably concluded that adoption by the current caregivers would provide B.M. with the predictability and stability she needs, and that these benefits outweighed any harm B.M. would suffer from the termination.

Contrary to mother's argument, the court did not rely on improper factors in rejecting the parental-benefit exception. At the conclusion of the hearing, after the termination of parental rights, the court stated, "I would just also say that the caregivers, and I think [mother] would probably be in agreement with this as well, have really gone out of their way to make sure family relationships are supported. And I just don't see them not doing that. All of these kids know their parents. And so they are – I said it a million times. [Mother] has said it as well. You know, when her dad passed away I felt like the caregivers were grieving with her. We all were grieving with her. And there's a photo of the caregivers on my bench because I find them to be super human folks, and they love babies like crazy, and they respect

7

biological family as well. So my expectation is that that will continue. I can't make an order to that effect, but my gut says that that will continue for sure, as long as it's good for the kids. And I think that's all they really want, is whatever is good for the kids." The court's admiration of the prospective adoptive parents and its expectation that they would permit a continued relationship between mother and B.M. are not factors that may be considered in determining whether the exception to adoption applies. (See *In re J.D., supra*, 70 Cal.App.5th at p. 866 ["The Supreme Court made clear, among other things, that the juvenile court engaged in this challenging weighing task is not permitted to consider the possibility of any postadoption contact between parent and child."].) However, the court made its remarks after having reached its decision. Its subsequent comments were not an explanation of the reasons for its decision but appear to have been meant to comfort mother, recognizing her genuine affection for her daughter. The court's decision was based on appropriate considerations and may not be disturbed because of the court's solicitude.

### Disposition

The order terminating parental rights is affirmed.


POLLAK, P. J.

WE CONCUR:

BROWN, J.
GOLDMAN, J.


8